■ In the Matter of JOSEPH DD., a Child Alleged to be Abused or Neglected. SULLIVAN, COUNTY DEPARTMENT OF SOCIAL SERVICES, Petitioner; DEBRA DD. et al., Respondents. STEVEN H. KURLANDER, as Law Guardian, Appellant. [624 NYS2d 476] —Crew III, J. Appeal from an order of the Family Court of Sullivan County (Meddaugh, J.), entered August 17, 1994, which, *inter alia,* dismissed petitioner's application, in a proceeding pursuant to Family Court Act article 10, to adjudicate Joseph DD. to be abused or neglected by respondent Debra DD.

Respondent Debra DD. (hereinafter respondent) is the biological mother of Joseph DD. (born in 1990). On August 1, 1993, Joseph was brought to a hospital emergency room by his sitter, respondent Mary Ann EE., where he was treated for, *inter alia,* injuries to his left hand. Based upon Joseph's injuries and the manner in which the injuries allegedly occurred, hospital staff reported Joseph as a possible victim of abuse or neglect, and the Orange County Department of Social Services thereafter commenced this proceeding against respondent and the sitter.[1]

At the conclusion of the fact-finding hearing, Family Court ordered that Joseph be returned to respondent pending the outcome of this proceeding and issued an order of protection against the sitter. Ultimately, Family Court adjudicated Joseph a neglected child based upon the sitter's conduct but declined to make a finding of abuse or neglect against respondent, concluding that there was no evidence demonstrating that Joseph was injured while in respondent's care or that respondent had any reason to know that the child was in danger while in the sitter's care. This appeal by the Law Guardian followed.[2]

It is well settled that "[a] parent or other responsible party may only be held accountable * * * for the abusive [or neglectful] acts of another party * * * if he or she 'knew or

---

1. Upon discovering that all parties were residents of Sullivan County, this proceeding was transferred to Family Court, Sullivan County, and custody of Joseph was transferred to the Sullivan County Department of Social Services, which was substituted as petitioner in this proceeding.

2. Although the notice of appeal is premature in that it was filed prior to entry of the order from which the appeal is taken, we exercise our discretion and, in the interest of justice, deem the notice of appeal to be valid *(see, Matter of Charles BB.,* 179 AD2d 904, 905).

should reasonably have known' that the child was in danger" *(Matter of Robert YY.,* 199 AD2d 690, 692, quoting *Matter of Sara X.,* 122 AD2d 795, 796, *appeal dismissed* 69 NY2d 707). In other words, a finding of abuse or neglect may be sustained only where "it can be determined, on the basis of objective evidence, that a reasonably prudent parent would have acted differently and, in so doing, prevented the injury" *(Matter of Robert YY., supra,* at 692; *see, Matter of Scott G.,* 124 AD2d 928, 929).

In our view, no reasonably prudent parent, aware of the circumstances then existing, would have permitted his or her child to be cared for by Joseph's sitter. The record indicates that Joseph's sitter was an uneducated woman whose residence lacked running water, a working refrigerator and a stove. The record further reveals that the front door of the sitter's residence consisted of a sheet of plastic, and it appears that the sitter's primary source of income was derived from redeeming discarded cans and bottles. Indeed, the sitter testified that she was unable to take Joseph to the emergency room for treatment until she had redeemed a sufficient quantity of cans to pay for their transportation to the hospital, and it appears that the sitter was dependent upon such funds to purchase food for Joseph.

The fact that the sitter was entirely unsuited to care for Joseph, however, is not, in and of itself, sufficient to sustain a finding of neglect as to respondent. As the case law makes clear, it must be established that respondent knew or reasonably should have known that Joseph was in danger before any finding of neglect may be made against her. In this regard, we agree with Family Court that there simply is not sufficient evidence in the record to establish that respondent *knew* of the dangers to which Joseph was exposed when left in the sitter's care. It appears that respondent visited the sitter's residence on only one occasion prior to Joseph's admission to the hospital, and there is no indication in the record that respondent actually entered the residence at that time. Hence, there is nothing in the record to suggest that respondent personally observed the lack of appropriate appliances and facilities at the sitter's residence, nor is there any proof that the front door of the residence was missing at the time of this visit.

We reach a different conclusion, however, with respect to the question of whether respondent *should have known* that it was dangerous for her to leave Joseph in the sitter's care. The record establishes that respondent and the sitter had known

each other for approximately seven months, that respondent considered the sitter to be "like a stepmother to her" and that the sitter had cared for Joseph on a number of occasions, often for extended periods of time. The record further indicates that although respondent was under the impression that the sitter had two children, one of whom was deceased and the other of whom was thought to be mentally retarded, she never inquired as to the circumstances under which the one child had died or where the other child was living. Additionally, although respondent apparently believed that the sitter received some form of financial assistance, there is no indication in the record that respondent took any steps to ensure that the sitter had sufficient funds to purchase food for Joseph. Moreover, both the hospital records and the sitter's own testimony give rise to the inference that the sitter's judgment and thought processes were somewhat impaired. In this regard, the hospital records reflect that the sitter behaved in a rather bizarre fashion upon Joseph's admission. Notably the sitter, who did not know Joseph's last name at the time, gave Joseph's name as Ablemoesdud Norse, which the sitter testified was the name of her dead son, gave conflicting addresses for the child, and alternated between telling Joseph that she loved him, she hated him and that he was dead. As to the sitter's testimony at the hearing, she was, as Family Court aptly observed, often incoherent, and the transcript reflects a marked inability on her part to follow and answer even the most simple questions.

Simply stated, we find it inconceivable that a reasonably prudent parent would leave his or her child for an extended period of time without first investigating where the child would be staying and ensuring that the caregiver had sufficient resources to provide food and, if needed, emergency care for the child. There is no indication that respondent made any effort in this regard, and in view of her failure to testify we are permitted to draw the strongest possible inference against her as may be supported by the record (see, Matter of Tami G., 209 AD2d 869, 870). Additionally, given the length of time respondent had known the sitter, and taking into consideration the apparent closeness of their relationship, it is certainly reasonable to infer that respondent was in a position to familiarize herself with the sitter's living situation and ascertain whether the sitter was able to provide food and shelter for Joseph. Moreover, given the sitter's unusual behavior, which we find difficult to believe was confined to her appearances in the emergency room and Family Court, respondent

should have at least seriously questioned whether the sitter truly was competent to care for her child. Finally, we are of the view that a reasonably prudent parent would not, under the circumstances, go an entire week without contacting the child's sitter and/or knowing exactly where the child was staying.[3] In sum, we believe that the record as a whole supports the finding that respondent did not act as a reasonably prudent parent under the circumstances and, as such, Family Court erred in not finding that respondent had neglected Joseph by leaving him in the care of this sitter (see, Family Ct Act § 1012 [f] [i] [B]).

As a final matter, we reject the Law Guardian's alternative claim that Joseph's overall physical condition constitutes prima facie evidence of neglect by respondent. The fact that Joseph was underweight is not, in our view, sufficient to establish that respondent failed to provide the child with adequate food. Additionally, although Joseph's teeth apparently were quite decayed, there is evidence in the record indicating that respondent had attempted to secure dental treatment for Joseph and that she had been taking the child to a pediatrician on a regular basis (compare, Matter of Kevin J., 162 AD2d 1034). The Law Guardian's remaining contentions, including his assertion that Family Court erred in failing to order a psychological evaluation or conduct an in camera interview of Joseph, have been examined and found to be lacking in merit.

Mercure, J. P., Yesawich Jr., Peters and Spain, JJ., concur. Ordered that the order is modified, on the law, without costs, by reversing so much thereof as dismissed the petition against respondent Debra DD.; petition granted to said extent and Joseph DD. is adjudicated to be neglected by respondent Debra DD.; and, as so modified, affirmed.

---

3. We note that when respondent was questioned by the authorities as to Joseph's whereabouts in August 1993, she stated that although she knew the child was with the sitter, she had not heard from the sitter and did not know precisely where she and the child were.